| Reap. No. | Coll. No. | Plaintiff | Entry |
|---|---|---|---|
| R64/8482 | 02345 | NTN Bearing Corp. of Amer. | 851410 |
| R64/9652 | 02718 | Mitsubishi Incorp. | 1027577 |
| R64/7177 | 01967 | Mitsui & Co. | 530614 |
| R64/7178 | 01968 | Mitsui & Co., Ltd. | 501959 |
| R64/9689 | 02602 | Mitsubishi Incorp. | 860958 |

Entries retained for appeal time.

———◆———

**JUDSON SHELDON INTERNATIONAL CORPORATION, Island Woods International, Appellants,**

v.

**The UNITED STATES, Appellee.**

A.R.D. 295; Reap. R67/17097, R67/17105, R67/17103.

United States Customs Court, Second Division, Appellate Term.

Sept. 15, 1971.

Glad & Tuttle, San Francisco, Cal. (Edward N. Glad, San Francisco, Cal., of counsel), for appellants.

L. Patrick Gray, III, Asst. Atty. Gen. (Michael M. Hunter, New York City, trial atty.), for appellee.

Before RAO, Chief Judge, and FORD and NEWMAN, Judges.

NEWMAN, Judge:

This is an application for review by plaintiffs below of the decision and judgment of the trial court in Judson Sheldon International Corporation, Island Woods International v. United States, 64 Cust. Ct. 760, R.D. 11713 (1970). The merchandise involved is described on the invoices as "Prefinished Philippine Lauan Plywood", and consists of various styles of prefinished plywood panels, purchased by Island Woods International of California (I.W.I.),[1] through its buying agent, Island Woods, Inc. of Manila (I.W.M.). Such plywood was exported during the period between December 16, 1966 and February 2, 1967 by three Philippine mills: Findlay Millar Timber Company (Findlay Millar), International Hardwood and Veneer Co. of the Philippines (Inter-Wood), and Taggat Industries, Inc. (Taggat).

The importations were appraised on the basis of constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956;[2] but an amount representing a 1 percent buying commission was erroneously included in the appraised values.

Appellants contend that the proper basis for appraisement is export value as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra.*[3]

The parties have stipulated that the merchandise does not appear on the Final List promulgated by the Secretary of the Treasury, T.D. 54521.

## DECISION BELOW

The trial court found that during the period of exportation I.W.I. was a "selected purchaser at wholesale" within the meaning of section 402(f)(1)(B),[4] as well as a "related person" within the meaning of section 402(g),[5] and held that the record fails to establish that the selling prices for exportation to the United States of the subject merchandise "fairly reflect the market value" of said merchandise.

We are in full agreement with the trial court's determination that I.W.I. was a selected purchaser within the meaning of section 402(f)(1)(B); but we find that the record establishes that the invoice selling prices fairly reflect the market value of the merchandise. Accordingly, we reverse.

## STATUTES INVOLVED

Section 402(b) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 943:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

Section 402(f) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 944:

(f) Definitions.—For the purposes of this section—

---

1. Appellant Judson Sheldon International Corporation is a customhouse broker at the port of San Francisco, who made the entries for the account of appellant Island Woods International.

2. 19 U.S.C. § 1401a(d).

3. 19 U.S.C. § 1401a(b).

4. 19 U.S.C. § 1401a(f)(1)(B).

5. 19 U.S.C. § 1401a(g).

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, * * *

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

*   *   *   *   *   *

Section 402(g) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 945:

(g) Transactions Between Related Persons.—

(1) For the purposes of subsection (c) (1) or (d), as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have

been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

*   *   *   *   *   *

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; * * *

## THE RECORD

The record consists of the oral testimony of three witnesses and thirteen exhibits introduced by appellants; and one exhibit introduced by appellee. The official papers were placed in evidence by appellants, although not specifically marked as exhibits.

The trial court found the following facts (64 Cust.Ct. at 762):

Plaintiff's [sic] second witness was Mr. John G. Davidson, the president of I.W.I., the chief party of interest in this action. Its business is primarily the importing of plywood from the Philippines. Mr. Davidson, his brother and two other men are the sole owners of I.W.I. They also own I.W.M. which acts as the buying agent of I.W.I. in the Philippines.

The merchandise at bar consists of various styles of prefinished plywood panels. They were purchased by I.W.M. from three plywood mills in the Philippines, Findlay Millar, Taggat and Inter-Wood.

Mr. Davidson and his brother own most of the stock in the Findlay Millar mill and take an active role in the mill's affairs.

At the time the merchandise in issue was being sold to I.W.I., the above three mills were selling their entire output of prefinished lauan plywood to plaintiffs. This was necessitated by the fact that the mills were located in the forest and their port facilities were far from the normal shipping lanes.

In order for a ship to stop at the mill, the cargo had to fill the entire ship, thus necessitating large sales to one customer. Though I.W.I. was at the time the sole purchaser of the merchandise at bar, there was no agreement, oral or written, between the parties whereby it (I.W.I.) agreed to take the entire production of the three mills.

The prices paid by I.W.I. for the lauan plywood were established by the Taggat mill. Findlay Millar and Inter-Wood were paid the same price. Mr. Davidson stated that this was done to protect the minority shareholder of Findlay Millar.

### 1.

Initially, we shall determine whether the trial court correctly found that I.W.I. was a "selected purchaser" from the three exporting mills.

The "selected purchaser" provision in section 402(f) (1) (B) applies where the seller *selects* one or more purchasers, restricting its sales to them and not selling or offering its merchandise for sale to all purchasers at wholesale". Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846 (1964).

Moreover, it is fundamental that the purchase of the entire available quantity by one buyer does not make him a selected purchaser if the merchandise was freely offered on the same terms to all who cared to buy. See United States v. Thomas P. Gonzalez Corp., 66 Cust.Ct. ——, A.R.D. 283 (1971), and cases cited. Consequently, the fact that I.W.I. purchased the exporters' entire output of prefinished lauan plywood during the period of exportation would not *in itself* suffice to constitute the importer a "selected purchaser". There are, however, additional circumstances which warrant a finding that I.W.I. was a selected purchaser of the three exporting mills.[6]

The record shows that Philippine plywood mills exporting to the United States were required for practical reasons concerning production and shipping to select a large volume purchaser who would give them repeat orders, and to restrict their sales and offers to such customer. Accordingly, during the period of exportation the three exporting mills restricted their sales and offers of prefinished lauan plywood to I.W.I.

Thus, an affidavit by Jose Batenga, executive secretary of the Plywood Manufacturers Association of the Philippines, Inc. (exhibit 1), states: that it was the normal practice in the Philippine plywood export trade for each manufacturer "to sell most, if not all of his production to one main and large buyer in the United States although not necessarily having exclusive agreement with that buyer"; that "each plywood manufacturer in the Philippines has found that it is most advantageous to have one big buyer take his full production and it is to the manufacturer's interests to keep such customer happy by giving him much if not all of his production"; and that because of shipping conditions *"it would be quite impractical if mills were to sell to more than one buyer"*. [Emphasis added.]

Further, an affidavit by Richard Bartlett, Chairman of the board of Findlay Millar and of I.W.M. (exhibit 4), states: "Philippine mills making prefinished plywood for exportation to the United States usually sell their production to *one selected importer*". [Emphasis added.]

And, finally, affidavits by officers of Taggat and Inter-Wood (exhibits 2 and 3) indicate that those firms declined to sell to prospective buyers where the transactions appeared to be "one-shot deals", since they preferred to rely on customers who would give them repeat orders.

---

6. Appellants concede that I.W.I. was a selected purchaser of Findlay Millar within the ambit of section 402(f) (1) (B); but appellants argue that Taggat and Inter-Wood freely offered prefinished lauan plywood to all purchasers within the purview of section 402(f) (1) (A).

**1398**

■ Under the circumstances, it is clear that the exporting mills did not sell or offer for sale prefinished lauan plywood to "all purchasers at wholesale" (section 402(f) (1) (A)),[7] but rather those mills sold only to a selected customer (section 402(f) (1) (B)).

**2.**

■ The trial court concluded that Findlay Millar and I.W.I. were related persons within the meaning of section 402(g) of the Tariff Act of 1930, as amended. However, it suffices to point out "[t]he fact that the exporter and the importer are related has no bearing on the question of 'export value'." United States v. F. W. Myers & Co., Inc., 63 Cust.Ct. 706, A.R.D. 264, 306 F.Supp. 1396 (1969).

**3.**

■■ Where merchandise is sold to a selected purchaser, the existence of an export value under sections 402(b) and 402(f) (1) (B) depends upon whether there are sales in the ordinary course of trade [8] at prices which fairly reflect the market value of the merchandise. United States v. Acme Steel Company, 50 Cust. Ct. 529, 534, A.R.D. 152, 216 F.Supp. 448 (1963), aff'd 51 CCPA 81, C.A.D. 841 (1964). The language "price which fairly reflects the market value of the merchandise" in section 402(f) (1) (B) is intended to preclude an export value predicated upon a rigged price. See Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, 544, R.D. 11597 (1968), aff'd 64 Cust.Ct. 860, A.R.D. 273, 313 F.Supp. 1016 (1970).

Hence, we must now determine whether appellants satisfactorily established that the selling prices to I.W.I. fairly reflected the market value of the merchandise.

In Mannesmann-Meer, Inc. v. United States, 58 CCPA 6, C.A.D. 995 (1970), the dispositive issue was "whether the Customs Court erred in finding that appellant's evidence failed to prove that the price paid fairly reflected the market value of the merchandise * * *". We quote *in extenso* the comments of the appellate court concerning the evidentiary standards to be observed: [9]

* * * Appellant contends, and we agree, that there should be no hard and fast rule as to the proofs needed to establish that a price to a selected customer fairly reflects the market value. As pointed out by McCormick in his work on Evidence, there is no necessary significance in whether a given fact to be proved is "ultimate" or not, and the distinction between "facts" and "conclusions" is illusory; all testimony is based to some extent on unstated premises and hence is conclusory. McCormick on Evidence §§ 11, 12 (1954). It is eminently clear that the question of what evidence is sufficient to support a trier's finding that a presumption has been rebutted should not be decided on such artificial dichotomies as facts vs. conclusions, or ultimate facts vs. evidentiary facts. We do not view the *Brooks Paper* case [40 CCPA 38, C.A.D. 495 (1952)] as establishing a general rule that the presumption of correctness can never be overcome by testimony on ultimate facts. The strength of the evidence should be assessed in practical terms, considering such factors as completeness, adequacy of bases, and possible motives to deceive.

We now turn to the evidence in the present case.

The record establishes that there was no relationship between Taggat (the price leader) and I.W.I. other than seller

---

7. 19 U.S.C. § 1401a(f) (1) (A).

8. The trial court found that sales were made in the ordinary course of trade. We agree with that finding.

9. Significantly, in *Mannesmann-Meer* the appellate court also pointed out that the

appraiser's use of a constructed value basis of appraisement does not necessarily give rise to a presumption that the appraiser found that the sales price to the exporter's selected customer did not fairly reflect market value.

and selected purchaser during the period of exportation; that there was no relationship between the three exporting mills other than as competitors in the sale of plywood; and that Taggat's prices for its plywood were based upon the prices being charged for comparable plywood in Japan, Korea, Formosa and the Philippines (exhibit 2).

In an affidavit (exhibit 6) by the president of the Plywood Manufacturers Association of the Philippines from 1961 to 1966, affiant states that Taggat, Inter-Wood and Findlay Millar "were shipping export plywood to the United States at prices comparable to those of other mills and in many instances, even higher than those of the others". The foregoing statement was assertedly predicated upon confidential information to which the affiant had access while he was president of the plywood association.

■ It is now well established by a line of authorities that, in determining whether invoice prices fairly reflect the market value of merchandise, the court may consider evidence concerning the production costs entering into export transactions and profit. See e. g., United States v. Acme Steel Company, 50 Cust. Ct. 529, 536–537, A.R.D. 152 (1963), 216 F.Supp. 448, aff'd 51 CCPA 81, C.A.D. 841 (1964); United States v. F. W. Myers & Co., Inc., 63 Cust.Ct. 706, 713–715, 717, A.R.D. 264, 306 F.Supp. 1396, 1402–1405 (1969); Robert E. Landweer & Co., Inc., A/C Robert Newton & Sons, Inc., et al. v. United States, 63 Cust.Ct. 682, 686, A.R.D. 261 (1969); Majestic Electronics, Inc. v. United States, 63 Cust.Ct. 628, 636, R.D. 11686 (1969); J. L. Wood v. United States, 58 Cust.Ct. 682, R.D. 11292 (1967). Thus, we have noted that an affidavit and cost statement by its comptroller (exhibit 7) establishes that Findlay Millar's selling prices for prefinished lauan plywood (which were the same as those of Taggat and Inter-Wood) covered all costs of production (viz., for lumber, glue, prefinishing materials, direct and indirect labor, operating supplies and overhead), packing costs, and a substantial profit.

■ ■ In our opinion, the selling prices of the three exporting mills were shown to be bona fide market prices—not rigged prices—which fairly reflected the market value of the merchandise, as required by section 402(f) (1) (B). We conclude, therefore, that appellants have established a *prima facie* case for export value under section 402(b); and consequently, appraisement on the basis of constructed value is precluded. *Majestic Electronics, Inc., supra.*

## FINDINGS OF FACT

1. The importations consist of various styles of prefinished lauan plywood panels manufactured and exported from the Philippines between December 16, 1966 and February 2, 1967 by three mills: Findlay Millar, Inter-Wood, and Taggat.

2. The imported plywood was purchased by I.W.I. (through its buying agent I.W.M.) and there were no restrictions as to the disposition or use of the merchandise.

3. Appellant Judson Sheldon International Corporation entered the shipments at the port of San Francisco, California for the account of appellant I.W.I.

4. The merchandise does not appear on the Final List published by the Secretary of the Treasury in T.D. 54521.

5. The merchandise was appraised on the basis of constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165; the appraiser included an amount representing a 1 percent buying commission in the appraised values.

6. Philippine plywood mills exporting to the United States were required for practical reasons concerning production and shipping to select a large volume purchaser who would give them repeat orders and to restrict their sales and offers to such purchaser. This method of doing business was the normal practice in the Philippine plywood export trade.

7. The exporting mills herein sold their entire output of prefinished lauan

plywood panels to I.W.I. and the merchandise was not offered to any other United States firm.

8. Inter-Wood and Taggat declined to sell plywood to prospective purchasers where the transactions appeared to be "one-shot deals", since they preferred to rely on a customer which would give them repeat orders.

9. The prices charged for the merchandise by the Taggat mill were followed by Inter-Wood and Findlay Millar; and Taggat's prices were based upon the prices being charged for comparable plywood in Japan, Korea, Formosa and the Philippines.

10. The prices charged by the exporting mills were in line with what other plywood producers were charging, and in many instances were higher.

11. There was no relationship between Taggat and I.W.I. other than seller and selected customer during the period of exportation. There was no relationship between the three exporting mills other than as competitors in the sale of plywood. Mr. Davidson and his brother, who were the sole owners of I.W.I., also owned most of the stock in the Findlay Millar mill and took an active role in the mill's affairs.

12. Findlay Millar's selling prices for prefinished lauan plywood (which were the same as those of Taggat and Inter-Wood) covered all costs of production, packing costs, and a substantial profit.

## CONCLUSIONS OF LAW

1. The merchandise was sold in the ordinary course of trade to a selected purchaser at wholesale at a price which fairly reflected the market value of the merchandise, without restrictions as to the disposition or use of the merchandise by the purchaser.

2. Export value as defined in section 402(b) of the Tariff Act of 1930, as amended, is the proper basis for appraisement of the merchandise.

3. The said export values are the invoice selling prices plus, when noted on the invoices, a separate charge for cartons.

4. The decision and judgment of the trial court is reversed.

Judgment will be entered accordingly.