**ERNEST LOWENSTEIN, INC.**

v.

**UNITED STATES.**

**R.D. 11779; Court No. R64/2246.**

United States Customs Court.

Jan. 27, 1977.

Siegel, Mandell & Davidson, New York City (Steven S. Weiser and Harvey A. Isaacs, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Glenn E. Harris, New York City, trial attorney), for defendant.

MALETZ, Judge:

This case is again before the trial court on remand by order of the Appellate Term, Second Division of this court, 74 Cust.Ct. 189, A.R.D. 322 (1975). The background is this: An application for review had been taken by the plaintiff to the Appellate Term from the decision and judgment of this court in *Ernest Lowenstein, Inc. v.*

*United States*, 71 Cust.Ct. 201, R.D. 11776, 367 F.Supp. 1330 (1973), sustaining the appraised export values of certain glass stones, pendants, beads and similar merchandise (hereinafter referred to as "stones and beads") that were exported from Austria, the country of manufacture, in March 1963 and entered at the port of New York in April 1963.

While this application for review was pending, the Court of Customs and Patent Appeals rendered its decision in *J. L. Wood v. United States*, C.A.D. 1139, 505 F.2d 1400, 62 CCPA 25 (1974), discussed *infra*, which in large part overruled a number of prior cases setting out the criteria for determining whether, in a selected purchaser situation, a purchase price fairly reflects the market value of the merchandise. In view of the decision in *J. L. Wood*, the Appellate Term *sua sponte* remanded this case to the trial court "for all purposes." Upon remand, both sides were given an opportunity to present additional evidence, with the defendant availing itself of this opportunity.

The record establishes that the imported stones and beads (which were used to make costume jewelry) were produced in Wattens, Austria by D. Swarovski & Co. (Swarovski), the sole manufacturer in that country of such or similar articles. Swarovski had sold the merchandise for export to the United States at its published list prices, less 15 percent, to Lowenstein Overseas Company (LOC), a Liechtenstein concern to which it was totally unrelated, under a distributorship agreement appointing LOC the exclusive distributor of such articles for export to all countries outside of Europe.

LOC in turn resold the merchandise to the plaintiff-importer Lowenstein, its exclusive customer in the United States, at the Swarovski list prices, less 12½ percent.

Under the sales practice prevailing at the time, when LOC received an order for stones and beads from the plaintiff, LOC would place an identical order with Swarovski, instructing the latter to ship the merchandise directly from Wattens, Austria to plaintiff in the United States. Upon ship-

ment of the merchandise, Swarovski billed LOC at the published list price, less 15 percent, and LOC, in turn, billed plaintiff at list, less 12½ percent.

The shipment herein was entered at LOC's invoiced unit price to plaintiff, i. e., list, less 12½ percent. However, the appraising officer, using export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, as the basis of appraisement, valued the merchandise at the *Swarovski* list prices, which he arrived at by adding 14.3 percent to LOC's invoiced unit prices to plaintiff.

Plaintiff agrees that export value is the proper basis of appraisement but contends that the statutory export values are represented by Swarovski's sales to LOC (list, less 15 percent) which, in terms of the official action taken, are the appraised values, less 15 percent.

The statutory provisions covering export value to the extent relevant here are contained in section 402 of the Tariff Act of 1930, as amended (19 U.S.C. 1401a), and read as follows:

(b) *Export Value.*—For the purposes of this section, the export value of the imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*     \*     \*     \*     \*     \*

It is to be added that there is no dispute that the sale in controversy was between Swarovski and LOC; that the merchandise was not on the Final List; that there is no issue as to usual wholesale quantities; that the merchandise was sold for export to the United States from Austria; that the principal market was Wattens, Austria; and that LOC, as the exclusive purchaser for export to the United States during the involved period, was a selected purchaser at wholesale within the meaning of section 402(f)(1)(B).

In this setting, plaintiff's claim is grounded upon the above cited provisions of section 402, as amended, which allows sales to one or more selected purchasers to be adopted as the proper measure of export value if the prices fairly reflect the market value of the merchandise. Thus, the sole question presented here is whether plaintiff has met its burden of proving that the appraised values are erroneous and that Swarovski's prices to its selected purchaser,

LOC, i. e., list, less 15 percent, fairly reflected the market value of the merchandise.

The case, as initially tried on this issue, was presented and decided in accordance with a line of decisions, commencing with *United States v. Acme Steel Company*, 51 CCPA 81, C.A.D. 841 (1964), wherein the Court of Customs and Patent Appeals had held (p. 89) that—

> * * * all sales in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise and that evidence of price, and hence of the value of goods in the foreign market, is relevant to the ultimate determination of the export value of imported merchandise within the ambit of section 402(b) of the Tariff Act of 1930, as amended, supra, in the case of sales to selected purchasers.

In the cases following *Acme*, it was held that proof of sales in the ordinary course of trade in the country of exportation for home consumption and, where available, to third countries other than the United States, was relevant in selected purchaser situations as a standard against which to compare the claimed prices and to ascertain whether or not they fairly reflected the market value of the goods sold or offered for sale for exportation to the United States. E. g., *John V. Carr & Son, Inc. v. United States*, 52 CCPA 62, C.A.D. 860 (1965); *Myerson Tooth Corporation v. United States*, 64 Cust.Ct. 860, A.R.D. 273, 313 F.Supp. 1016 (1970). Thus, if the export price to the United States was lower than the domestic price in the exporting country or the price to third countries, but the price differential could be justified—as attributable, for example, to certain expenses not incurred in producing for export to the United States—the courts have found that the selling price to the United States embodied all of the material elements entering into the statutory definition of export value. *United States v. Acme Steel Company, supra; John V. Carr & Son, Inc. v. United States, supra; C. J. Tower & Sons of Niagara, Inc. v. United States*, 60 Cust.Ct. 938, A.R.D. 233 (1968).

Another method of establishing that the sale for export to the United States was at a price fairly reflective of market value was to prove that the transaction was the result of *bona fide* negotiations and that the price was high enough to include all costs of production, general expenses entering into the export transaction, and a profit. *United States v. F. W. Myers & Co., Inc.*, 63 Cust.Ct. 706, A.R.D. 264, 306 F.Supp. 1396 (1969), *appeal dismissed*, 57 CCPA 141 (1970); *Judson Sheldon International Corporation v. United States*, 67 Cust.Ct. 577, A.R.D. 295, 331 F.Supp. 1393 (1971), *appeal dismissed*, 59 CCPA 223 (1971).

In sum, until *J. L. Wood* was decided in December 1974, the approaches outlined above were utilized to determine export value in cases where the claimed values were predicated upon sales to a selected purchaser. See generally Sturm, *A Manual of Customs Law* (1974) pp. 79–83.

In these circumstances, at the previous trial plaintiff sought to establish its claimed values by comparing, and attempting to reconcile, Swarovski's sales to LOC for export to the United States at list, less 15 percent, with Swarovski's sales of identical merchandise (1) in the home market to Austrian manufacturers and other Austrian purchasers at list with no discount, and (2) to manufacturers in some European countries at list with no discount and to dealers in other European countries at list, less discounts ranging from 10 to 19 percent.[1]

At the first trial defendant called Egon Rausnitz, a partner in Wepra Company (Wepra), located in New York City, and Abraham Frankel, "part owner" of Fred

---

1. During the period in issue, approximately 15 percent, in monetary terms, of Swarovski's total sales of stones and beads was shipped to Austrian manufacturers and dealers; 30 percent was shipped to manufacturers and dealers in other European countries; 40 percent to LOC's customer, plaintiff-Lowenstein, in the United States; and 15 percent to other LOC non-European customers.

Frankel & Sons, Inc. (Frankel), also located in New York City.

Mr. Rausnitz testified that prior to 1965 his firm Wepra was engaged mainly in the wholesaling of stones and beads, most of which were purchased from plaintiff in New York. During 1962 and 1963 Wepra purchased some Swarovski merchandise from International Export of Vaduz, Liechtenstein at prices lower than it would have paid plaintiff for the goods. At about the end of 1964, Wepra purchased such merchandise from the firm of Neuman and Wenzel of Linz, Austria ( a local manufacturer of costume jewelry) at a discount of 6.8 percent off the Swarovski list price and in April 1965 it commenced to buy directly from Swarovski.

Mr. Frankel, whose firm has imported beads, trimming and rhinestones for 60 years, testified that from 1953 through 1961 his firm purchased "quite a few million dollars" worth of Swarovski merchandise from Dr. Josef Russ, an exporter in Linz, Austria, who had in turn bought them from Neuman and Wenzel of Linz. The witness stated that in 1961 his purchases from Russ amounted to "as a guess, four, five hundred thousand dollars" (R. 29) and that they decreased in succeeding years.

The record evidence pertaining to these two witnesses was not detailed in the trial court's opinion but was characterized as indicating that although most of the merchandise sold by Swarovski in the home market to Austrian purchasers "apparently was used for home consumption * * * a small, undisclosed amount found its way to two dealers in the United States." *Ernest Lowenstein, Inc. v. United States, supra*, 71 Cust.Ct. at 203, n. 3, 367 F.Supp. at 1332.

The trial court found, however, that plaintiff was unable to reconcile satisfactorily the disparities between Swarovski's prices to LOC and its varying prices, whether at discount or at the list prices, for domestic consumption in Austria and to third countries. It held, therefore, that plaintiff had failed to establish that the prices to LOC fairly reflected the market value of the merchandise and affirmed the appraised values. *Ernest Lowenstein, Inc. v. United States, supra.*

While the *Lowenstein* application for review was pending before the Appellate Term, the decision in *J. L. Wood* came down, as heretofore noted, and overruled in major respects *Acme Steel* and much of the case law stemming therefrom. More specifically, in the *Wood* case, our court of appeals reexamined the amended export value provision of section 402 in light of its legislative history and concluded that Congress clearly intended that export value was to be determined by considering *only* the exporting country's market for exportation to the United States. It specifically overruled *Acme Steel* to the extent that it approved consideration of sales in the domestic market of the exporting country in the determination of export value. The court further held that "market value" to be fairly reflected pursuant to subdivision 402(f)(1)(B) is the market value for exportation to the United States, that is, the price which the merchandise is able to command in that market. See Sturm, *A Manual of Customs Law* (Supp.1976) p. 26. As the court stated in *Wood* (505 F.2d at 1405, 62 CCPA at 32–3):

> * * * Although the term "market value" in section 402(f)(1)(B) was not defined in the Act, it obviously must relate to the relevant market. In the case of export value, this would be the export market in the exporting country to the United States and *not the foreign domestic market,* since use of the latter would result in a determination of foreign value, which was deleted by the Act.

From the foregoing, we conclude that Congress clearly intended that export value be determined by considering *only the exporting country's market for exportation to the United States* and that sales at wholesale to exclusive or selected agents be used in determining export value if the prices fairly reflect the market value. *United States v. Acme Steel Co.,* 51 CCPA 81, C.A.D. 841 (1964) is hereby overruled to the extent that it approved consideration of sales in the domestic

market of the exporting country in the determination of export value. * * *

* * * * * *

The "market value" which must be fairly reflected according to section 402(f)(1)(B) is the market value for exportation to the United States (i. e., export value), and this is the price which the merchandise is able to command in the market for exportation to the United States.[2] [Emphasis added in part.]

The court also observed by way of footnote that the prices to selected purchasers were to be "measured against the market value and not some other standard such as costs of production."[3]

■ Thus, under the new formula, as enunciated in *Wood*, export value may be determined only by considering sales in the exporting country's market for exportation to the United States, and the court is precluded from considering sales in the domestic market of the exporting country or to third countries. Furthermore, in the absence of any sales or offers of sale, the costs of purchasing the merchandise may no longer be taken into account.

■ With the foregoing in mind, it follows that, if the "market value" which must be fairly reflected in sales to selected purchasers is the "price which the merchandise is able to command in the market for exportation to the United States" (505 F.2d at 1406, 62 CCPA at 33), all export sales to purchasers in the United States, unless made under abnormal or irregular conditions, are appropriate for consideration in determining statutory export value. Indeed, as this court reads *Wood*, such sales constitute the only relevant market evidence against which the prices to the selected purchaser may be compared in determining "market value."

Viewed in this perspective, the record, as supplemented after remand to this court, takes on a different dimension. At the second hearing, plaintiff offered no additional evidence, but defendant recalled the

witnesses Rausnitz and Frankel who had testified at the earlier hearing.

At the second hearing, Mr. Rausnitz was unable to recall when or from whom Wepra had purchased the additional Swarovski items, but indicated that they were insubstantial compared to his purchases from plaintiff-Lowenstein, which constituted approximately 90 to 95 percent of the total.

Mr. Frankel testified that, from 1953 to the period immediately preceding March 1963, he had purchased Swarovski stones and beads from Dr. Russ in Linz, Austria at approximately 90 percent of the Swarovski list price (i. e., Swarovski's list price, less 10 percent). Frankel's annual purchases from Dr. Russ amounted to approximately one million dollars, but only 40 percent of this amount was for Swarovski stones and beads. Frankel in turn resold the articles to jewelry manufacturers.

It is important to emphasize that Frankel's purchases were not made directly from Swarovski, but through Dr. Russ who had purchased them from Neuman and Wenzel, a local costume jewelry manufacturer in Linz, Austria, which in turn bought them from Swarovski. Thus, although there were two intervening distributors, each of whom, it must be presumed, obtained a profit, Frankel was nonetheless able since 1953 to purchase the merchandise at Swarovski's list price, less 10 percent, as compared to Swarovski's sales to LOC at Swarovski's list price, less 15 percent.

■ We find that the sales to Frankel were substantial, regular and made in the ordinary course of trade at the third level of distribution; and that the prices paid by Frankel at this level may be easily equated with—at the very least, they approximate— the prices paid by LOC at the primary level to the manufacturer. More particularly, the fact that two intervening parties (i. e., Neuman and Wenzel, and Dr. Russ) could buy and sell this merchandise, presumably making a profit on each transaction, and the resultant sale to a United States pur-

---

**2.** Footnotes omitted.

**3.** 505 F.2d at 1405, 62 CCPA at 32, n. 13.

chaser (Frankel) was only 5 percent higher than to a purchaser (LOC) buying directly from the manufacturer is in the court's view clear indication that the latter sale fairly reflects the market value of the goods. We find, therefore, that the sales to Frankel fully support plaintiff's claim that Swarovski's sales to LOC at the list price, less 15 percent, fairly reflect their market value.[4]

Nor do we find merit to defendant's contention, raised for the first time after the rehearing, that plaintiff had failed to show that LOC's 15 percent discount resulted from *bona fide* arm's length negotiations. In the first place, Swarovski was unrelated to LOC by consanguinity, corporate affiliation, interlocking equity, stock ownership, or otherwise. Further derogating from defendant's contention is the evidence (previously set forth) of the sales in Austria of Swarovski stones and beads for export to Frankel in the United States at prices which enabled him, although third removed in the line of distribution, to resell the merchandise at "cheaper prices" than the Swarovski list prices and only 5 percent higher than Swarovski's prices to LOC, its primary distributor. Finally, there is not even a scintilla of evidence in the record that the dealings between Swarovski and LOC were anything but at arm's length and *bona fide* in all respects. *Cf. Spanexico, Inc. v. United States*, 75 Cust.Ct. 123, C.D. 4616, 405 F.Supp. 1078 (1975), *aff'd*, 542 F.2d 568, 64 CCPA ——, C.A.D. 1176 (1976).

Significant too is the additional consideration that where, as here, the seller, Swarovski, is the sole manufacturer in the country of exportation, which company made sales for export to the United States exclusively to a wholly unrelated company, LOC (the merchandise being consigned and shipped directly to plaintiff) without restriction as to the disposition or use of the merchandise in the United States, the price between the parties is not one which merely "fairly reflects" market value, it is *the* mar-

ket value of the merchandise within the statutory understanding. For the price to LOC was one which that buyer (LOC) was willing to pay and the seller (Swarovski) was willing to take, thereby establishing the market value of the goods. As stated in *J. L. Wood, supra*, 505 F.2d at 1406, 62 CCPA at 33:

> In this case, we have all necessary market evidence, since Carter, Ltd., sells for export to selected purchasers in the United States—Carter, Inc. [a related purchaser] and the OEMs. The price to the OEMs and to Carter, Inc. is the same. Because the OEMs are unrelated to Carter, Ltd., or Carter, Inc., *further proof of what price the merchandise is able to command in the market is not needed.* We join the trial court in saying: "What better proof is there of the price fairly reflecting the market value when sales are made to other unrelated United States concerns at the same basic price." [Emphasis added; footnote omitted.]

Here, LOC stands in the shoes of the unrelated purchasers to which the court looked for the purpose of determining whether the price between the related parties was at market value. Had there been a second related purchaser in the present case, the court, as it did in *Wood*, would have compared the prices to that company with the LOC price. In this circumstance, it would be completely illogical to accord this LOC price a less or different status because of the absence of a related purchaser.

In conclusion, and for the foregoing reasons, plaintiff's claim that the appraised values, less 15 percent, represent the proper statutory export values of the merchandise in issue is sustained. Judgment will be entered accordingly.

---

4. The record evidence as to the sales to Wepra is disregarded as vague, inconclusive and, moreover, as having been directed in part to sales for export from Liechtenstein which, of course, is not the "country of exportation" for purposes of the valuation statute.