## UNITED STATES

v.

## ERNEST LOWENSTEIN, INC.

### A.R.D. 325, Court No. R64/2246.

United States Customs Court,
Second Division,
Appellate Term.

May 22, 1978.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Glenn E. Harris, New York City, Trial Atty., for appellant.

Siegel, Mandell & Davidson, New York City (Steven S. Weiser and Harvey A. Isaacs, New York City, of counsel), for appellee.

Before RAO, FORD and NEWMAN, JJ.

NEWMAN, Judge:

This case is before us on application by the Government (defendant below) for review of the decision and judgment of the trial judge (Maletz, J.) in *Ernest Lowenstein, Inc. v. United States,* R.D. 11779, 425 F.Supp. 856, 78 Cust.Ct. 169 (1977), sustaining the dutiable export values claimed by appellee (plaintiff below).

The importation consisted of certain glass stones, pendants, beads, and similar merchandise (hereafter, stones and beads) that were exported from Austria in March 1963

and entered at the port of New York (consumption entry No. 996721) in April 1963. The imported merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b), at the invoiced unit prices plus 14.3 percent. These appraised values represent the "world list prices" published by the Austrian manufacturer, D. Swarovski & Co. (Swarovski).[1]

■ Appellee concedes that export value is the proper basis for appraisement, but claims that the proper dutiable values are the appraised values (viz., "world list prices") less 15 percent. These claimed values represent the prices at which the manufacturer sold the stones and beads to Lowenstein Overseas Company (LOC), its "selected purchaser" within the purview of section 402(f)(1)(B) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)(1)(B)).[2]

As stated above, Judge Maletz sustained appellee's claimed values. We affirm.

## STATUTES INVOLVED [3]

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a), read:

(b) *Export Value.* For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchan-

---

1. The merchandise was invoiced to appellee by Lowenstein Overseas Company of Liechtenstein (LOC), appellee's parent company, but was shipped directly by the manufacturer from Austria to appellee in New York. The prices at which Swarovski invoiced LOC were its world list prices less 15 percent, and LOC in turn invoiced the appellee at the world list prices less 12.5 percent. Thus, the prices invoiced to appellee were 87.5 percent of the world list prices. Increasing these prices, as the appraiser did by 14.3 percent, caused the appraised values to equate with the world list prices without discount, and the appraised values are expressly based upon them.

2. The "selected purchaser" provision in section 402(f)(1)(B) applies where the seller "*selects* one or more purchasers, restricting its sales to them and not selling or offering its merchandise for sale to all purchasers at wholesale". *Aceto Chemical Co., Inc. v. United States,* 51 CCPA 121, 127, C.A.D. 846 (1964); *Judson Sheldon International Corporation, Island Woods International v. United States,* 331 F.Supp. 1393, 67 Cust.Ct. 577, 580, A.R.D. 295 (1971). It is undisputed that LOC was a "selected purchaser" within the purview of the statute.

3. The merchandise is not specified on the "Final List", T.D. 54521.

dise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) *Definitions.* For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

## THE RECORD

The record comprises the oral testimony of two witnesses called by appellant and various documentary exhibits submitted by both parties. Appellant's witnesses were: Egon Rausnitz, a partner in the Wepra Company (Wepra); and Abraham Frankel, secretary and treasurer of Fred Frankel & Sons, Inc. (Frankel).

The record establishes the following relevant facts:

It appears that the imported stones and beads, used primarily for making costume jewelry, were manufactured in Wattens, Austria by Swarovski, the sole manufacturer in that country of "such or similar" articles. All sales for exportation to the United States of Swarovski stones and beads from Austria were handled administratively in Wattens. Swarovski published and circulated to its customers a "world price list" covering the merchandise.

Swarovski had a distributorship agreement with LOC, a totally unrelated company located in Liechtenstein. Under that agreement, LOC was appointed as the exclusive distributor for the sale of Swarovski stones and beads in all countries throughout the world, except Europe. LOC purchased the Swarovski stones and beads for exportation to the United States at the manufacturer's world list prices less a discount of 15 percent [4]—which prices are claimed by appellee to represent the correct dutiable export values of the merchandise.

Appellee was, in turn, the sole or exclusive United States purchaser of the Swarovski merchandise sold to LOC, which firm in its resales invoiced appellee at Swarovski's list prices less 12.5 percent. Under the sales practice prevailing at the time, when LOC received an order from appellee, LOC placed an identical order with Swarovski, and instructed the latter to ship the merchandise directly from Wattens, Austria to appellee in the United States. Through this reinvoicing procedure and direct shipment by Swarovski to appellee in the United States, the merchandise never physically entered the commerce of Liechtenstein, and therefore the country of exportation was Austria and not Liechtenstein.

In addition to sales of stones and beads by Swarovski for exportation to the United States through LOC, two firms in the United States, Wepra and Frankel, imported the Swarovski articles during the time of the instant importation by appellee.

4. Swarovski's prices did not vary with the quantities sold, and the only restriction upon LOC's use of the merchandise was that its resales be limited to the assigned territories, including the United States.

Frankel imported Swarovski's stones and beads from Dr. Josef Russ, a seller in Linz, Austria who had in turn obtained the merchandise from Neuman and Wenzel, a manufacturer of costume jewelry in Linz, which firm in turn purchased the stones and beads from Swarovski. Although Frankel was on a third level of sales (viz., there were two intervening sellers after Swarovski), Frankel was buying the merchandise at 10 percent below Swarovski's world list prices.

Prior to 1965, Wepra was engaged primarily in wholesaling stones and beads, obtained mostly from appellee. However, during 1962 and 1963, Wepra purchased Swarovski stones and beads at the world list prices from Internationale Export Etabl. of Vaduz, a Liechtenstein firm, at a time when there was a shortage of supply from appellee. Appellee supplied approximately 90 to 95 percent of Wepra's needs, and Wepra's supplemental purchases from the Liechtenstein firm were insubstantial compared with its purchases from appellee.

## DECISIONS OF THE TRIAL COURT

In its initial decision, R.D. 11776, 367 F.Supp. 1330, 1333, 71 Cust.Ct. 201, 204 (1973), the trial court stated: "The sole issue, as the parties agree, is whether the prices paid by LOC to Swarovski—i. e., list, less 15 percent—fairly reflect the market value of the merchandise within the meaning of section 402(f)(1), as amended, and, hence, represent statutory export value [footnote omitted]". Following *United States v. Acme Steel Company,* 51 CCPA 81, C.A.D. 841 (1964) and a line of decisions predicated on that case, Judge Maletz found that appellee had failed to satisfactorily reconcile the disparities between Swarovski's discounted prices to its selected purchaser (LOC) and its varying prices, whether at discount or at list prices, for domestic consumption in Austria and for sales to third countries. Accordingly, in its first decision the trial court held that plaintiff

failed to establish that the prices to LOC fairly reflected the market value of the merchandise and affirmed the appraised values.

In due course, an application for review of the initial decision was filed by plaintiff, appellee herein. After briefs had been submitted and oral argument presented, and while the case was *sub judice,* the Court of Customs and Patent Appeals handed down its decision in *J. L. Wood v. United States,* 505 F.2d 1400, 62 CCPA 25, C.A.D. 1139 (1974). In *J. L. Wood,* our appellate court abolished much of the established criteria for determining whether a price to a selected purchaser fairly reflects the market value of the merchandise, upon which the trial judge had relied in his first opinion.[5]

More specifically, *J. L. Wood* "overruled" *Acme Steel* "to the extent that it approved consideration of sales in the domestic market of the exporting country in the determination of export value", holding (505 F.2d at 1405, 62 CCPA at 32–33):

\* \* \* Although the term "market value" in subdivision 402(f)(1)(B) was not defined in the Act, it obviously must relate to the relevant market. In the case of export value, this would be the export market in the exporting country to the United States and *not the foreign domestic market,* since use of the latter would result in a determination of foreign value, which was deleted by the Act.

From the foregoing, we conclude that Congress clearly intended that export value be determined by considering *only the exporting country's market for exportation to the United States* and that sales at wholesale to exclusive or selected agents be used in determining export value if the prices fairly reflect the market value. *United States v. Acme Steel Co.,* 51 CCPA 81, C.A.D. 841 (1964) is hereby overruled to the extent that it approved consideration of sales in the domestic

**5.** Judge Landis observed in *American Greiner Electronic, Inc. v. United States,* C.D. 4718, 441 F.Supp. 915, 919, 79 Cust.Ct. 92, 96 (1977): "The *Wood* decision has rendered obsolete much, if not all, of the case law that preceded it

as to the kind of proof considered relevant in determining that a price to a selected purchaser fairly reflected market value". See also *D. H. Baldwin Co. et al. v. United States,* 78 Cust.Ct. 164, C.D. 4704 (1977), *appeal pending.*

market of the exporting country in the determination of export value. * * *

* * * * * *

The "market value" which must be fairly reflected according to subdivision 402(f)(1)(B) is the market value for exportation to the United States (i. e., export value), and this is the price which the merchandise is able to command in the market for exportation to the United States. [Footnotes omitted; emphasis added in part].

In light of the *J. L. Wood* decision, this Division by an order dated April 3, 1975, *sua sponte* remanded the within case to the trial court "for all purposes" (74 Cust.Ct. 189, A.R.D. 322 (1975)). Thereafter, the case was reopened for further evidence, and appellant recalled its witnesses Rausnitz and Frankel, who had testified at the first hearing. Appellee presented no additional evidence.

In his second decision (under review here), Judge Maletz, following "the new formula, as enunciated in *Wood*", commented (425 F.Supp. at 861, 78 Cust.Ct. at 175):

* * * if the "market value" which must be fairly reflected in sales to selected purchasers is the "price which the merchandise is able to command in the market for exportation to the United States" (505 F.2d [1400] at 1406, 62 CCPA at 33), all export sales to purchasers in the United States, unless made under abnormal or irregular conditions, are appropriate for consideration in determining statutory export value. Indeed, as this court reads *Wood*, such sales constitute the only relevant market evidence against which the prices to the selected purchaser may be compared in determining "market value".

*Viewed in this perspective, the record, as supplemented after remand to this court, takes on a different dimension.* * * * [Emphasis added].

Turning to the record, as supplemented after remand, the trial court disregarded the evidence concerning sales to Wepra as "vague, inconclusive and, moreover, as hav-

ing been directed in part to sales for export from Liechtenstein which, of course, is not the 'country of exportation' for purposes of the valuation statute". (425 F.Supp. at 862, 78 Cust.Ct. at 176, n. 4). Judge Maletz also noted that Rausnitz' (Wepra's) purchases of the additional Swarovski items "were insubstantial compared to his purchases from plaintiff-Lowenstein, which constituted approximately 90 to 95 percent of the total" (425 F.Supp. at 861, 78 Cust.Ct. at 175).

On the other hand, the trial judge held that the sales to Frankel fully support appellee's claim that Swarovski's prices to LOC fairly reflected the market value of the merchandise. Thus, the court said (425 F.Supp. at 861, 78 Cust.Ct. at 176):

We find that the sales to Frankel were substantial, regular and made in the ordinary course of trade at the third level of distribution; and that the prices paid by Frankel at this level may be easily equated with—at the very least, they approximate—the prices paid by LOC at the primary level to the manufacturer. More particularly, the fact that two intervening parties (i. e., Neuman and Wenzel, and Dr. Russ) could buy and sell this merchandise, presumably making a profit on each transaction, and the resultant sale to a United States purchaser (Frankel) was only 5 percent higher than to a purchaser (LOC) buying directly from the manufacturer is in the court's view clear indication that the latter sale fairly reflects the market value of the goods. We find, therefore, that the sales to Frankel fully support plaintiff's claim that Swarovski's sales to LOC at the list price, less 15 percent, fairly reflect their market value [footnote omitted].

Moreover, Judge Maletz found no evidence in the record that the dealings between the manufacturer and its unrelated selected purchaser were anything but at arm's length and *bona fide* in all respects. In the trial court's view, the status of LOC as an unrelated selected purchaser is analogous to the status of the unrelated selected purchasers in *J. L. Wood*, whose purchase prices were considered by the Court of Cus-

toms and Patent Appeals as demonstrative that the prices to a related selected purchaser fairly reflected the market value of the merchandise. The trial judge thus opined that it would be completely illogical to accord LOC's prices a less or different status because of the absence in this case of a related purchaser.

Finally, the trial court held that where, as here, the sole manufacturer of the merchandise in the country of exportation (Swarovski) sold to a wholly unrelated company (LOC) without restriction as to the disposition or use of the merchandise in the United States, "the price between the parties is not one which merely 'fairly reflects' market value, it is *the* market value of the merchandise within the statutory understanding" (425 F.Supp. at 862, 78 Cust.Ct. at 177). (Trial court's emphasis).

Accordingly, appellee's claimed values were sustained as the proper dutiable export values of the merchandise.

### OPINION

Briefly stated, the issue is whether the trial court correctly determined that the proper dutiable export values of the merchandise were the appraised values less 15 percent.

Although initially it may appear somewhat anomalous that appellee is claiming, and the trial court found, export values *lower* than the prices at which LOC invoiced the merchandise to appellee (Swar-

ovski's list prices less 12.5 percent), it must be borne in mind that the merchandise was not exported from Liechtenstein by LOC (the merchandise never having entered the commerce of that country), but rather exported from Austria by Swarovski. Since the merchandise was destined for exportation to the United States at the time it was sold by Swarovski to LOC at list prices less 15 percent, such sale was "for exportation to the United States" within the meaning of section 402(b), there being no requirement that the *purchaser* be located in the United States. See the trial court's initial opinion, 71 Cust.Ct. 201, 204, n. 7. The foregoing construction of the statute is undisputed by appellant.

From the two decisions of the trial judge, it is evident that the sole issue tried, briefed and decided was whether appellee had met its burden of proving that the manufacturer's prices to its selected purchaser fairly reflected the market value of the merchandise within the ambit of section 402(f)(1)(B). In seeking reversal, appellant has now admittedly "reversed its field" and insists that the merchandise was freely sold to "all purchasers at wholesale" within the purview of section 402(f)(1)(A); and that therefore "it is improper under the statute [section 402(f)(1)] to have recourse to a 'selected purchaser' price for export value purposes, notwithstanding that the 'selected purchaser' sales were made by Swarovski itself". (Appellant's brief, p. 19).[6] Appellant further contends that the trial court

---

**6.** We have noted that at the first oral argument before this Division the Government conceded that the appraisements could not be sustained on the basis of sales to all purchasers at wholesale at the secondary level of sales. Thus, the transcript shows the following (Tr. 27, 41–42):

"MR. HARRIS: * * * One of the things we did attempt to do at the trial was to determine if there were free sales of these beads and stones from sellers other than D. Swarovski & Company, and the evidence showed otherwise. Now, to that extent, he can say, truthfully, that we have not substantiated our appraisement because our appraisement could have been sustained on the basis of such evidence as that, but it showed otherwise.

   *    *    *    *    *    *

MR. HARRIS: * * * However, regardless of whether anyone else on the secondary level of sales was selling—was freely selling this merchandise for export to the United States, one must still first take the price of Swarovski to Lowenstein Overseas Corporation because that is the primary level of sales, and that would prevail. Anything beyond that is irrelevant at this point. We are at the point of whether there is a value at the primary level of sales. So, everything else is moot because that deals with the secondary level of sales. * * *"

Moreover, in its post-trial brief after remand, page 12, n. 5, defendant (appellant) urged: "It is apparent that Fred Frankel & Sons, Inc. and the Wepra Company were likewise *selected purchasers,* though on the secondary level of sales". (Emphasis added).

erred in relying upon the prices paid by Frankel to support its conclusion that the manufacturer's prices to LOC fairly reflected the market value of the merchandise.

Appellee argues that Swarovski's prices to LOC fairly reflected the market value of the merchandise, but that the trial court should have disregarded the sales to Frankel as well as to Wepra. Further, appellee disputes appellant's assertion that section 402(f)(1)(A) takes precedence over section 402(f)(1)(B), insisting that "the legislative history reveals that these sections must be read together * * *". (Appellee's brief, p. 14).

This case has been exhaustively tried, thoroughly briefed, and ably argued orally by counsel for both parties. From our review of the record and Judge Maletz' meticulously prepared opinion, we find that he has made a very perceptive and searching analysis of the evidence, and we are in complete accord with his findings of fact and conclusions of law.

At this juncture, we must stress that the initial decision of the trial court sustaining the appraised values was rendered in accordance with *Acme Steel* and before the decision by the Court of Customs and Patent Appeals in *J. L. Wood*. Understandably, therefore, the trial court's rationale and the result reached in its second decision which followed *J. L. Wood* were quite different from the rationale and the result reached in the first decision upholding the appraisement.

■ Although we could readily pause here and affirm the judgment of the trial court, we wish to comment on the new theory urged by appellant that at the secondary level of sales the stones and beads were freely sold at the appraised values to "all purchasers at wholesale" within the purview of section 402(f)(1)(A).

In this connection, appellant argues that the trial court erred in disregarding the evidence of sales to Wepra, as shown by exhibits T through Z, which comprise photocopies of certain entries made by Wepra late in 1962 and early 1963 and the special customs invoices accompanying those entries.

We are not persuaded that exhibits T through Z support the Government's appraisement, since there is no evidence that the sales to Wepra by the Liechtenstein seller, Internationale Export, were made in the ordinary course of trade or in the principal markets of Austria.

A dash of reality is useful—makes the point more succinctly, and supports it more sharply with evidence! The record is clear that Wepra's importations of the additional Swarovski articles were made solely under conditions of short supply of the merchandise from appellee, Wepra's regular supplier (R. 84, 133–34). Moreover, we find no basis in the record for holding that Linz, Austria was a principal market, as now contended by appellant. The parties have stipulated that there is no issue concerning "principal markets" (see trial court's Memorandum and Order on Pretrial Conference, p. 4, December 9, 1969); and further, in its present brief (p. 9) appellant conceded: "No question is presented concerning the location of *the* principal market for the merchandise in Austria, which obviously was Wattens, the location of the general administrative offices of Swarovski". (Footnote omitted; emphasis added).

In sum, the evidence fails to establish that the merchandise was freely sold to all purchasers at wholesale at the secondary level of sales at prices equivalent to the appraised values. The appraisement admittedly was not predicated upon sales at the secondary level, and there is no evidence that sales at the secondary level to Wepra were made in the ordinary course of trade or in the principal markets of Austria.[7]

---

7. In its post-trial brief after remand, p. 12, defendant (appellant herein) conceded that "the appraisement of the involved merchandise had been premised on the sales to other purchasers in the United States having been free

sales by *Swarovski*, and that the evidence had failed to substantiate that premise". (Emphasis added). In view of this concession, we see no basis for any subsidiary presumption in this case that the sales to Wepra by the *Liechten-*

Consequently, we need not reach appellant's contention that determination of export value pursuant to section 402(f)(1)(B) is precluded when there are sales to all purchasers at wholesale at the secondary level.[8] We find that the presumption of correctness attaching to the appraised values has been overcome by appellee, and that under the facts of this case the trial court has properly applied the selected purchaser provision of the statute (section 402(f)(1)(B)) in determining the proper dutiable expert value of the merchandise. Therefore, we find no reversible error in the decision and judgment of the trial judge, and affirm. The findings and conclusions of law in the opinion of the trial judge are hereby adopted as our own, and incorporated herein by reference.

Judgment will be entered accordingly.

The court wishes, again, to commend counsel for the respective parties in this case for their excellent briefs and oral arguments which have been most helpful to us in considering the issue presented.

*stein firm* were in the ordinary course of trade or in the principal markets of Austria.

**8.** The Government argued to the contrary in its post-trial brief before remand (p. 21) and at the first oral argument (Tr. 41–42) that sales at the secondary level by someone other than the manufacturer, were "irrelevant" or "moot", since such sales could *not* be looked to for export value purposes in preference to sales directly by the manufacturer at the primary level. Appellant has now changed its position on this point, urging that sales within the purview of section 402(f)(1)(A) at a secondary or lower level of distribution take precedence over direct sales by the manufacturer at the primary level to a selected purchaser within the purview of section 402(f)(1)(B).