(E) The final list (Tuesday, January 28, 1958, 23 F.R. 539).

4. The merchandise in issue was appraised on the basis of United States value, as defined in section 402a(e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, pursuant to paragraph 28 (c) and (d) of the Tariff Act of 1930, as amended.

5. The coal-tar dye known as "Neolan Flavine GFE 24%" was not appraised during the fiscal year 1954.

6. The instant merchandise was appraised at $1.7511 per pound, net, packed, on the basis of United States value.

We conclude as matters of law:

1. The inclusion of the merchandise at bar in the final list was within the proper exercise of the power of the Secretary of the Treasury.

2. The proper basis for appraisement of the merchandise in controversy is United States value, as that value is defined in section 402a(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra*.

3. That said value is represented by the appraised value, namely, $1.7511 per pound, net, packed.

Judgment will be entered affirming the judgment of the trial court.

(A.R.D. 188)

MAGNOLIA PETROLEUM COMPANY *v.* UNITED STATES

Entry No. B–47, etc.

## Second Division, Appellate Term

(Decided April 26, 1965)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the appellant. *John W. Douglas*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the appellee.

Before RAO and FORD, Judges

FORD, Judge: Appellant has brought this application for review of the judgment of the lower court in five reappraisement appeals, R58/23368 through R58/23372, which were consolidated for trial. *Magnolia Petroleum Company* v. *United States*, 53 Cust. Ct. 355, Reap. Dec. 10786, decided June 30, 1964.

The importations in controversy, the dutiable valuation of which is at issue, consist of what is described in the record as a chrome bead catalyst, which was manufactured and exported from West Germany during the months of December 1956 and January, February, and March 1957. Each of the shipments was made prior to the effective date—February 27, 1958—of the Customs Simplification Act of 1956.

The shipments were appraised at a unit value of 180 deutsche marks per 100 kilos pursuant to the provisions of section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U.S.C. § 1402(c)), on the basis of foreign value.

It is claimed by appellant that, during the period of exportation of the subject shipments, there was no foreign value for such or similar merchandise by reason of legal restrictions requiring purchasers thereof to secure a license from third persons permitting the use of the commodity.

It is also claimed that there was no export value for such or similar merchandise, within the meaning of the statute, because the sole manufacturer of the merchandise in West Germany did not freely offer it for sale for export to the United States.

Furthermore, it is asserted that, since the importations were consumed by the Magnolia Petroleum Company—the importer-appellant—and were not offered for sale by it, there could be no statutory United States value for such or similar merchandise within the meaning of section 402(e) of said tariff act, as amended, *supra*.

In view of the foregoing, the only alternative claim by appellant is that the proper basis for appraisement is statutory cost of production, as defined in section 402(f) of said act.

STATUTES

Section 402 of the Tariff Act of 1930, or as amended, *supra:*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*         \*         \*         \*         \*         \*         \*

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1)  The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2)  The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3)  The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4)  An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The evidence consists of the testimony of plaintiff's witness, Oswald G. Hayes; plaintiff's exhibit 2, a sample of the imported commodity; plaintiff's exhibit 3, an affidavit of Marshal N. Clark; plaintiff's exhibit 4, an affidavit of Dr. F. Goebel; and defendant's exhibit A, a foreign agents' report, dated July 2, 1958, prepared by Treasury Representatives Arno Hellthaler and A. John Kessel; also the consular invoices relating to the shipments in controversy.

The witness, Hayes, an experienced and well-qualified patent lawyer, testified in substance that he had been employed for over 20 years in the Patent Department of Socony Mobil Oil Co. and had practiced patent law extensively in the Court of Customs and Patent Appeals and in the United States Patent Office. He was intimately familiar with the imported commodity having negotiated the license and the technical information in connection therewith. He prepared the patent applications on chrome catalysts through the United States Patent Office as well as applications for patents in some 25 foreign

countries. He described the manufacture of the product as a unique and "new composition of matter."

As stated by the witness:

I have been engaged in handling the patent applications on the single process on which this catalyst is used since the time before I entered the employ of Socony Mobil, and continuously since. I wrote many of the patent applications on the process, and a number of others have been prepared by attorneys in our employ under my supervision.

Hayes testified that he was familiar with the use of the subject merchandise in the refining of petroleum, having observed it many times.

The chrome bead catalyst in controversy consists of highly porous beads having a surface of 350 square meters per gram. Hayes had made a licensing agreement between his company and Kali-Chemie, the manufacturer of the imported merchandise in West Germany. That concern was the only company licensed to manufacture the product and was obligated to pay royalties to Socony on all sales made of chrome bead catalyst. In 1956, he had completed arrangements for licensing all users of chrome bead catalysts in the refining of petroleum.

The affidavit of Marshal N. Clark, plaintiff's exhibit 3, states that he was manager of staff services for Magnolia Petroleum Corp. at the Beaumont refinery during the year 1957 and that the importations in controversy were consumed at that refinery; that they had never been offered for resale; and that they were the only purchases of the material through the years of 1956 and 1957.

The affidavit of Dr. Goebel, plaintiff's exhibit 4, states that he had been the plant manager of Kali-Chemie since 1947 and was in charge of the manufacture of chrome bead catalyst in the years 1956 and 1957; that the shipments to the Magnolia Petroleum Corp. were manufactured at the Kali-Chemie plant and are identical to the chrome bead catalyst manufactured and sold to consumers in West Germany and in other countries during the months of December 1956, January, February, and March 1957; that the time required to manufacture the chrome bead catalyst was approximately 5 days; and that no other producer in West Germany manufactured a chrome bead catalyst similar to that manufactured by Kali-Chemie. To quote the witness:

* * * the chrome bead catalyst is a unique product quite unlike all other catalysts manufactured in West Germany during 1956 and 1957 for use in petroleum refining.

It appears further, from the affidavit of Dr. Goebel, that the only commercial use of chrome bead catalyst was for refining petroleum; that, during the period of the exportations under consideration, it was sold to petroleum refiners, the smallest quantity in any given sale in the usual course of trade being 15,000 kilograms. Sales in smaller

amounts were occasionally made to other purchasers for experimental purposes; sales for exportation to the United States were limited to the Magnolia Petroleum Corp. only, to which five shipments were made.

Cost-of-accounting records of plant operations referred to in the 3d, 4th, and 5th pages of exhibit 4 will not be considered, in view of our conclusion herein.

As stated in the opinion of the court below:

The issue in the case at bar is whether the fact that the purchaser of the involved merchandise had to obtain from the holder of certain patent rights a license to use the product in a patented petroleum refining process constituted such a "restriction" as to preclude a finding of foreign value for the merchandise.

The trial judge was of the opinion that the mere fact that purchasers of such merchandise, as here involved, had to obtain a license in order to make use of the material produced by a patented process, did not *ipso facto* create a controlled market in a legal sense.

The trial judge was further of the opinion that, even though purchasers of the merchandise in controversy used or attempted to use it without license from the holders of the patent rights and might be subject to litigation was not inimical to a free offering of the merchandise as between seller and purchaser.

Whether or not control by a third party, not privy to a sale, might, under certain circumstances, create a restriction negating a free offering is not necessary to determine here. This is particularly so in view of the evidence which establishes that such merchandise was, in fact, sold to persons not licensed to use the cracking process. In addition, it is also to be noted that there was no policing of this requirement by the holder of the patent. Accordingly, under the principles enunciated in *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740, this arrangement would not fall within the category of a restriction.

Appellant places much reliance upon the following cases: *United States* v. *Graham & Zenger, Inc.*, 31 CCPA 131, C.A.D. 262; *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 CCPA 1, C.A.D. 115; and *Polaroid Corporation* v. *United States*, 235 F. 2d 276.

In the *Graham* case, it appears all glass manufacturers in Belgium formed a syndicate which was under the direct supervision of the Belgium Government. The purpose of this arrangement was to stabilize the glassware industry. All manufacturers of glassware in Belgium were compelled to join the syndicate which fixed minimum prices at which the manufacturers were compelled to dispose of their products not only for home consumption, but in each of the countries to which such glassware was exported.

The court, in the course of its opinion, stated:

* * * The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint.

The court there clearly had in mind a "sale" of goods accompanied by restraint.

In the *Half Moon* case, manufacturers of certain merchandise entered into an agreement fixing the prices at which sales would be made but provided that those to whom sales were made for use in Holland might not export bottle caps except after they had been attached to bottles.

The agreement further provided that the manufacturers, in making offers of sale to dealers, other than users in Holland, must expressly stipulate that such dealers should not resell the merchandise in Holland below prices specified in the offer.

It clearly appears that, in both of the cases just discussed, there was an agreement among the manufacturers which imposed a restriction with respect to the resale or use of a commodity.

The appellant contends further that the *Polaroid* case is authority for its contention that the transaction between Kali-Chemie and the refiners of petroleum in West Germany was not a "sale" in contemplation of law; that it was merely a physical transfer of the property from the manufacturer to the refiner.

Consequently, it is argued that, since the refiner must secure a license from Socony Mobil Oil Co. to use the product, it constituted a restriction on the use of the merchandise thereby precluding the application of the statutory foreign value which, among other things, required that there must be free offers for sale to all purchasers.

In the *Polaroid* case, it appears that a manufacturer of cameras was under contract with the Polaroid Corp., a patent holder, to which it shipped cameras, either directly or to patent holder's consignees.

Stated in the headnote to the case, there appears the following:

A "sale" which conveys no right to use or resell property, but only bare right to possession, is not a "sale" within meaning of statute imposing tax on certain articles sold by manufacturer, producer or importer. 26 U.S.C.A. (I.R.C. 1939) § 3406(a)(4).

and, as stated by the court in the course of its opinion:

This is a test case to determine whether the incidence of this tax is upon Polaroid or upon Greist Manufacturing Company, a Connecticut corporation having its principal place of business in Connecticut, which was permitted by the judge below to intervene.

Section 3406 of the Internal Revenue Act, there under consideration, provided in part:

(a) *Imposition.* There shall be imposed on the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to the rate, on the price for which sold, set forth in the following paragraphs * * *.

The language of the statute involved in the *Polaroid* case and its interpretation and application by the court in the circumstances of

that case are not applicable in the consideration of section 402(c), as amended, *supra*.

We have carefully examined all the authorities cited and discussed by opposing counsel but they bear factual differences from the case at bar which renders them inapplicable to the determination of the instant case.

In view of the conclusion we have reached, we find it unnecessary to consider alternative claims of appellant.

We find no reversible error in the judgment appealed from, which is hereby affirmed.

Based upon the record and for the reasons above stated, we find as facts as follows:

1. That the involved merchandise consists of certain chrome bead catalyst, manufactured by Kali-Chemie A.G., Hanover, West Germany, and exported therefrom in December 1956, and January, February, and March 1957.

2. That, at the times of exportation of the involved merchandise, such or similar merchandise was freely offered for sale for home consumption to all purchasers in the principal markets of West Germany, in the usual wholesale quantities and in the ordinary course of trade, there being no restriction or control imposed upon the sale of the merchandise so as to preclude for customs purposes a finding of foreign value.

3. That the evidence in this case fails to establish that the appraised values are erroneous and that the other values claimed by the appellant are correct.

We conclude as matters of law:

1. That foreign value, as that value is defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis for the determination of the value of the merchandise here involved,

2. That such value for the merchandise in question is in each case the appraised value, and

3. That the judgment of the court below should be affirmed.