(C.D. 4827)

INTERNATIONAL ARMAMENT CORPORATION, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. R69/9754

(Decided November 1, 1979)

*Shaw, Pittman, Potts & Trowbridge*, Esqs. (*Dean D. Aulick* and *Robert E. Zaler*, Esqs. of counsel) for the plaintiff.

*Alice Daniel*, Acting Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation, *John J. Mahon*, trial attorney, Esqs., for the defendant.

NEWMAN, Judge: Plaintiff, in this consolidated action, challenges the appraised values of certain pistols, accessories (holsters and magazines), and air pistols exported from the Federal Republic of Germany (West Germany) by the company of Carl Walther Sportwaffenfabric (Walther) in July and August 1968, and entered at the Port of Alexandria, Va.

The parties agree that the pistols (not including the air pistols) are on the final list published by the Secretary of the Treasury pursuant to section 6(a) of the Customs Simplification Act of 1956, T.D. 54521, and therefore valuation is governed by the provisions of section 402a of the Tariff Act of 1930, as amended (19 U.S.C. 1402). Further, it is undisputed that the other merchandise, viz, the accessories and air pistols, is not on the final list and accordingly appraisement of that merchandise is governed by the provisions of section 402 of the Tariff Act of 1930, as amended (19 U.S.C. 1401a).

The final list merchandise (pistols) was appraised on the basis of foreign value as defined in section 402a(c) while the other merchandise (accessories and air pistols) was appraised on the basis of constructed

value as defined in section 402(d). Respecting the final list merchandise, plaintiff contends that there are no foreign, export, or U.S. values as defined in section 402a (c), (d), and (e), and that cost of production as defined in section 402a(f) is the correct basis for appraisement. Alternatively, plaintiff claims U.S. values for certain of the pistols in issue. Plaintiff further claims that the accessories and air pistols are properly dutiable on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended.

### *Statutes Involved*

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. 1401a):

(a) Except as otherwise specifically provided for in this chapter, the value of imported merchandise for the purposes of this chapter shall be—
(1) the export value, or
(2) if the export value cannot be determined satisfactorily, then the U.S. value, or
(3) if neither the export value nor the U.S. value can be determined satisfactorily, then the constructed value;
except that, in the case of an imported article subject to a rate of duty based on the American selling price of a domestic article, such value shall be—
(4) the American selling price of such domestic article.

#### EXPORT VALUE

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*        \*        \*        \*        · \*        \*        \*

#### CONSTRUCTED VALUE

(d) For the purposes of this section, the constructed value of imported merchandise shall be the sum of—
(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which

would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*    \*    \*    \*    \*    \*    \*

## DEFINITIONS

(f) For the purposes of this section—

(1) The term "freely sold, or in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

   (A) to all purchasers at wholesale, or
   (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, U.S. value, or constructed value, as the case may be, can be satisfactorily determined:

   (A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

(5) The term "usual wholesale quantities," in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Section 402a of the Act (19 U.S.C. 1402):

(a) For the purposes of this chapter the value of imported articles designated by the Secretary of the Treasury as provided for in section 6(a) of the Customs Simplification Act of 1956 shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the U.S. value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the U.S. value can be satisfactorily ascertained, then the cost of production;

(4) In the case of an article with respect to which there is in effect under section 1336 of this title a rate of duty based upon the American selling price of a domestic article, then the American selling price of such article.

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### FOREIGN VALUE

(c) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

## EXPORT VALUE

(d) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

## U.S. VALUE

(e) The U.S. value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities, and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

## COST OF PRODUCTION

(f) For the purposes of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

\*　　\*　　\*　　\*　　\*　　\*　　\*

*The Record*

Plaintiff introduced in evidence the oral testimony of three witnesses, three affidavits, the official entry papers and other documentary exhibits. Defendant submitted four reports of Customs representatives, a copy of a request for admissions served on plaintiff, and other documentary exhibits. The pertinent facts will be reviewed infra in connection with the discussion of the issues raised by the parties.

At trial, decision was reserved concerning defendant's objection to the admission into evidence of plaintiff's exhibit 12 for identification, which comprises a "Supplemental Response by Defendant to Interrogatories and Request for Production of Documents" (R. 97). Defendant's objection is sustained since, as correctly observed by defendant's counsel in his objection at the trial (R. 93–94), the supplemental response does not relate to the merchandise or time period involved in the present case.

*Final List Merchandise (Pistols)*

1

As heretofore mentioned, the pistols in issue (other than the air pistols) are on the final list and were appraised on the basis of foreign value, as defined in section 402a(c) of the Tariff Act of 1930, as amended. Plaintiff maintains that it has negated the applicability of foreign value for the pistols because in 1968 they were not freely offered for sale to all purchasers in West Germany. Fundamentally, under the statute, there was no foreign value for the pistols unless at the time of exportation they were freely offered for sale in the home market to all purchasers.

Plaintiff has advanced three restrictions on the sale of the pistols in question in support of its contention that they were not freely offered for sale to all purchasers in West Germany at the time of exportation. These restrictions are that Walther: (a) Pursued a program of resale price maintenance; (b) restricted sales to selected quality customers; and (c) restricted sales to persons holding the required West German firearms licenses or permits. In light of the issues raised by the foregoing asserted sales restrictions, plaintiff argues that the instant case "closely tracts" *Berben Corporation* v. *United States*, 45 Cust. Ct. 482, R.D. 9785 (1960), *rev'd and rem'd*, 49 Cust. Ct. 497, A.R.D. 147 (1962), *on remand*, 51 Cust. Ct. 314, R.D. 10552 (1963) (brief, pp. 4–5).

Defendant insists that plaintiff has failed to establish that the pistols were not freely offered for sale for home consumption to all purchasers. Additionally, defendant argues that even if a foreign value did not exist for the Walther pistols before the court, plaintiff failed to prove that foreign value did not exist for similar merchandise.

I have concluded that the record establishes the market restrictions asserted by plaintiff. Specifically, the restrictions on Walther's home market sales are established by the affidavits (and attached supporting documentation) of Carl Heinz Walther and Joachim Hertrampf, respectively the managing director and home market sales manager of the Walther company (exhibits 1 and 2). In substance, the affidavits of Messrs. Walther and Hertrampf show that during the pertinent period of time Walther pursued resale price maintenance practices and followed a policy of restricting its sales to selected quality customers; and that these policies extended to and restricted both the wholesale and retail levels of distribution. It further appears that the restrictive market practices were enforced to the extent of refusals to deal when necessary. These resale price maintenance and customer selection practices pursued by Walther clearly preclude the existence of a foreign value for the pistols, since the merchandise was not freely offered for sale to all purchasers as contended by plaintiff. *United States* v. *Philipp Wirth et al.*, 20 CCPA 94, T.D. 45705 (1932); *Berben, supra. Cf. Inter-Maritime Forwarding Co., Inc.* v. *United States*, 65 Cust. Ct. 814, A.R.D. 278, 318 F. Supp. 218 (1970), *aff'd*, 59 CCPA 84, C.A.D. 1044, 454 F. 2d 1197 (1972).

Defendant urges that the Walther and Hertrampf affidavits be disregarded, and that instead the Court rely upon the information contained in defendant's exhibit E, a Customs representative report. Exhibit E contains information obtained in 1972 from Mr. Peter Hoffmann, the then export manager of Walther, to the effect that the only restriction on Walther's sales in the home market was that Walther was required by West German law to sell only to licensed dealers.

In all candor, I can attach little weight to the report of Mr. Hoffmann's statements in defendant's exhibit E. There is nothing in that report showing that as export manager Hoffmann was knowledgeable concerning Walther's home market sales practices. It should be emphasized that Hertrampf, not Hoffmann, was the Walther official responsible for domestic sales in West Germany during the pertinent period of time. *Cf. Nichols & Company, Inc.* v. *United States*, 59 CCPA 67, 72, C.A.D. 1041, 454 F. 2d 1183 (1972). Significant too, is the fact that there is no indication in the report (exhibit E) that Hoffmann's statements related to Walther's sales practices during the pertinent period of time involved in this case, viz, July and August 1968. On its face, Hoffmann's statements as reported by the Customs representative relate to Walther's sales practices in 1971–72—a period not involved in the present case. However, it is noteworthy that in a Customs representative report dated September 9, 1976 (exhibit F), which covers the calendar year 1968, Mr. Hoffmann is reported by the representative as having stated that Walther administered a

price maintenance program. And in another Customs representative report dated October 2, 1978 (exhibit G), Hoffmann is reported to have stated that the price maintenance program and customer selection restriction were dropped by Walther in 1974 by virtue of a change in West German law, and the threat of lawsuits. Defendant's exhibits F and G, then, are consistent with and corroborate the Walther and Hertrampf affidavits on the issue of market restrictions.

Defendant also contends that the Walther affidavit, executed on February 13, 1978, should not be accorded any weight because the affidavit states (on p. 9) that "the books of account of Walther are available for inspection by the U.S. Customs authorities", but when on September 12, 1978, a Customs representative attempted to verify the cost of production data pertaining to July and August 1968 contained in the affidavit, he was informed that the records were no longer available (exhibit G). Although the destruction of the manufacturer's records covering the pertinent period of time in this case is indeed unfortunate in light of the pending litigation, nevertheless I see no reason on that basis for discrediting Walther's statement in his affidavit concerning the existence of market restrictions. Plainly, the company's cost records have no relevance to the issue of market restrictions.

Under all the facts and circumstances, I find that the Walther company during the pertinent period of time (July and August 1968) practiced resale price maintenance and customer selection at all sales levels, and conclude that as a matter of law such restrictive practices preclude the existence of a foreign value for the Walther pistols in issue.[1]

It remains to be determined, however, whether a foreign value existed for "similar" pistols.

An importer wishing to negate the existence of foreign value on the basis of a lack of a free market for the merchandise in the country of origin must establish that "similar" as well as "such" merchandise was not freely offered for sale in the home market during the relevant time period. *Nichols & Company, Inc.* v. *United States, supra.*

Respecting the application to firearms of the statutory term "similar", plaintiff cites *B. A. McKenzie & Co., Inc., et al.* v. *United States,* 47 CCPA 143, C.A.D. 748 (1960), which is obviously in point. There, the core question was whether certain rifles sold in Sweden were "similar" in the sense of the statute to certain other rifles which were exported to the United States from Sweden. The record showed

---

[1] Hence, it is unnecessary to further decide at this juncture whether the West German gun licensing requirements negate the existence of foreign value. Gun licensing restrictions were mentioned in *Berben, supra,* as one of the bases for the nonexistence of a foreign value for the involved pistols.

that both rifles were bolt-action, five-shot repeater sporting rifles of the Mauser type and shared other common features. However, the rifles differed in several important aspects. In determining that the rifles were not "similar" for appraisement purposes, our Appellate Court observed in *McKenzie* (id. at 147):

> At the outset of this discussion it must be remembered that we are dealing with items whose every feature is important to the particular sportsman. We shall first turn our attention to exhibit 2. Aside from the fact that exhibit 1 has a single trigger and exhibit 2 a double trigger, which difference has been explained to our satisfaction, and aside from the many similarities between them noted by the appellants' witnesses, an examination of these two rifles reveals some very significant differences. The stock of exhibit 1 is made of arctic beech and has an oil finish, while the stock of exhibit 2 is made of walnut and has a lacquer finish. The widths of the stocks are different, that of exhibit 1 being much wider and bulkier. The front and the rear sights are constructed differently. Exhibit 2 has an extended cheek rest while exhibit 1 is without this feature. The bolt handles are constructed differently. There are also obvious differences in the overall craftsmanship of the two rifles. Furthermore, no price or value has been established for the Brno rifle of exhibit 2 which fact is significant in and of itself.
>
> Although appellants' witnesses testified that the apparent difference in the length of the barrel and the caliber of the rifles would not affect their prices, these specific differences, as well as the other differences noted, are undoubtedly important to the individual sportsman and as such are significant in determining the question of commercial interchangeability, which is one of the factors to be considered in ascertaining whether the merchandise is similar within the purview of section 402(c). *Meadows, Wye & Co. (Inc.) et al.* v. *United States*, 17 CCPA 36, T.D. 43324; *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714.

See also: *United States* v. *Oscar E. Eggen (American Express Co.) et al.*, 55 CCPA 95, C.A.D. 939 (1968), citing *McKenzie, supra.*

Regarding the lack of similarity of Walther pistols to other pistols sold in the West German market, Mr. Walther states (exhibit 1, p. 1):

> * * * These products [Walther pistols] are unique and are different from the products of other German manufacturers in style, design, workmanship, and selling price. In addition to superior craftsmanship and distinctive styling, the key distinguishing characteristic of a Walther pistol is its double action capability—the pistol uniquely combines the advantages of the pistol (magazine loading, ease of handling and accurate shooting) with that of the revolver trigger (safety while loaded). The pistol, designed for self-protection, thus can be carried in complete safety while loaded, yet is ready for instant use. * * *

Hence, in addition to differences in style, design, workmanship, and selling price, the affiant emphasized what is described as a unique feature of Walther pistols—their double-action capability (safe while loaded, yet ready for instant use). Walther's statement respecting uniqueness is uncontradicted or rebutted by defendant's evidence.

Defendant relies on *H. J. Heinz Company* v. *United States*, 43 CCPA 128, C.A.D. 619 (1956) with respect to the issue of "similar" merchandise. *Heinz* presented the question of whether two different qualities or grades of tomato pulp were "similar" for purposes of appraisement on the basis of foreign value. Predicated upon the fact that the imported Heinz tomato pulp and the inferior English home consumption pulp were made of approximately the same materials and were adapted to the same uses, and were so used, the Court of Customs and Patent Appeals found that the two grades of tomato pulp were "similar" for purposes of foreign value appraisement.

Significantly, in *McKenzie*, the appellants relied heavily on *Heinz*, but on that score our Appellate Court responded (47 CCPA at 149):

> Although appellants rely mainly upon the *Heinz* decision to maintain their position, we find that case not to be sufficiently in point to be controlling here *because the factual situations are entirely different.* * * * [Italic added.]

Similarly, I find that defendant's reliance on *Heinz* is misplaced in the present litigation. In the case of tomato pulp, obviously such factors as style, design, and workmanship are not involved. More importantly, the advantages inherent in the Walther pistol's double-action capability gave that merchandise a uniqueness which alone militates against a finding of similarity to other pistols not possessing such feature.[2] The Heinz tomato pulp, on the other hand, possessed no analogous unique feature distinguishing it from the English home consumption tomato pulp.

In view of the uncontroverted uniqueness and distinguishing features of the Walther pistols as compared with other pistols sold in the West German home market, I find that other pistols sold in the home market were not "similar" to the Walther pistols within the purview of section 402a(c) as amended. Accordingly, plaintiff has sustained its burden of proving the nonexistence of a foreign value for "similar" as well as "such" merchandise, and has overcome the statutory presumption of correctness attaching to the appraisement of the final list merchandise.

---

[2] Defendant stresses that in Walther's affidavit (exhibit 1, pp. 5-6), the affiant identifies four manufacturers of pistols in West Germany in 1968 other than Walther, and characterizes two of them as "main competitors". However, defendant overlooks that Walther identified the other pistol manufacturers concerning their *profit figures for cost of production* under sec. 402a(f). Under that section, the addition for profit relates to "merchandise of the same general character as the particular merchandise under consideration". Plainly, merchandise of the "same general character" may or may not be "similar" for purposes of sec. 402a.

## 2.

Inasmuch as the parties agree that export value as defined in section 402a(d) did not exist for the final list merchandise (pistols), we turn to the question of whether U.S. value as defined in section 402a(e) existed for that merchandise at the time of exportation.

Plaintiff argues that no U.S. value existed for the pistols because of the Federal, State, and local laws restricting the sale and possession of firearms and requiring licenses or permits.[3] The record shows that in compliance with the legal requirements concerning firearms licenses and permits imposed by the various levels of government, plaintiff restricted its sales of Walther pistols in the United States to U.S. citizens who had not been convicted of a major crime, who were not under indictment or fugitives, and who were 21 years of age or over.[4] Defendant, on the other hand, insists that gun control laws do not negate U.S. value. I agree with defendant's position.

In *Berben*, a gun licensing restriction under Italian law was one of the factors which Judge Richardson (writing for the third division, appellate term) noted had entered into plaintiff's customer selection practices. However, Judge Richardson's opinion is clear that it was the *arbitrary selection of particular customers by the seller* that was the decisive factor precluding the existence of a free market for the merchandise. See 49 Cust. Ct. at 501. Moreover, as pointed up by the defendant, a later decision by the Court of Customs and Patent Appeals in *United States* v. *Getz Bros. & Co. et al.*, 55 CCPA 11, C.A.D. 927 (1967), makes a definite distinction between restrictions predicated upon *governmental requirements*, such as licensing or quota limitations, as against restrictions based upon the *arbitrary marketing practices of a seller* which exclude certain purchasers or classes of purchasers from buying.

Thus, in *Getz* the appellate court addressed the question of whether an export quota and licensing system imposed by the Japanese Government so limited the class of buyers that plywood was not "freely offered" to all purchasers within the meaning of the statute. Concerning this phase of the case, the court stated (55 CCPA at 21–22):

> The appellant next urges that the appellate term erred in finding that the export quota system in Japan did not operate to limit

[3] Plaintiff similarly argued that the licensing and permit requirements imposed under West German law so restricted the sale of the Walther pistols in West Germany as to preclude the existence of a foreign value. Since resale price maintenance and customer selection practices by the manufacturer sufficiently negated the existence of foreign value, it was unnecessary to decide whether the West German licensing requirement also precluded a foreign value for the pistols.

[4] Plaintiff's vice president and treasurer, Mr. William F. Slye, explained that since the States had varying age requirements, for purposes of simplicity in making sales in compliance with the laws, 21 years was adopted by plaintiff as the minimum age requirement as a matter of company policy (R. 37).

the class of buyers with the result that the plywood was not "freely offered" to all purchasers at the lower mill prices.

The applicable provisions of section 402a(d) and 402(b) of the tariff laws both require, in finding "export value," that the merchandise must be freely sold or offered for sale to all purchasers in the ordinary course of trade. These requirements, as used in section 402, have been interpreted to mean that the merchandise must be "freely sold" or "offered for sale" to "all those who cared to buy such goods in such market" in the ordinary course of trade. Moreover, the merchandise need not be freely offered to all purchasers without limitation, but rather "in the ordinary course of trade." *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955); *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48308 (1936).

Appellees' position is:

> The fact that the purchaser must comply with these export regulations imposed by the Japanese authorities under a quota system controlling the exportation of plywood from Japan in no way limits the free offering on the part of the manufacturers of their product to all who cared to purchase. It was the responsibility of the purchaser, be he an American or a Japanese trading house, to secure an export license from Japan under the existing quota system. * * *

*In our view, requirements imposed by a sovereign which control the flow of goods from the country of the sovereign for a variety of reasons, do not prevent the lower court from finding that a free market existed. The existence of such a requirement does not defeat the concept of a "free offer" by the seller. Requirements such as quota limitations are clearly distinguishable from restrictions upon the free offering of merchandise imposed by the seller which arbitrarily exclude certain purchasers or classes of purchasers from buying from the seller.* Rico, Inc. v. United States, 44 Cust. Ct. 788, A.R.D. 121 (1960), affirmed, 48 CCPA 110, C.A.D. 773 (1961). See *Pacific Wood Products Co.* v. *United States*, supra (export quota); *National Carloading Corp.* v. *United States*, supra (export quota); *United States* v. *International Commercial Co. and Armour & Co.*, 28 Cust. Ct. 629, Reap. Dec. 8112 (1952); and *F. W. Kuehne Co.* v. *United States*, 12 Cust. Ct. 386, Reap. Dec. 5985 (1944), affirmed *United States* v. *F. W. Kuehne Co.*, 14 Cust. Ct. 356, Reap. Dec. 6110 (1945). Compare *United States* v. *Graham & Zenger, Inc.*, 31 CCPA 131, 134, C.A.D. 262 (1943) (Belgian Government precluded purchaser from disposing of property for any use except home consumption); *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129 (1940) (discounts allowed to purchaser by manufacturer dependent upon either the status of the purchaser or his bargaining ability); and *United States* v. *Glanzstoff Corp.*, supra (offer coupled with restriction that "loyalty discount" may be canceled by seller).

As this court stated in *Rico*, 48 CCPA at 112:

> * * * It would seem that to defeat the conception of a free offering the restriction would be one involving some form of

marketing practice resulting in the *arbitrary exclusion* from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all.

On this basis, we thus conclude that, as a matter of law, substantial evidence appears in the record to support the finding of the lower court that such merchandise was "freely offered" within the meaning of the statute. [Italic added.]

The export quota and licensing system for plywood in *Getz* is analogous to the licensing requirements pertaining to firearms in that the marketing restriction is imposed by the sovereign for reasons of public policy, as contrasted to a marketing practice of a particular seller that arbitrarily excludes certain purchasers or classes of purchasers from buying from the seller. Furthermore, as observed by our appellate court in *Getz*, the merchandise need not be freely offered to all purchasers without limitation, but rather "in the ordinary course of trade." 55 CCPA at 21. Inasmuch as the restrictions arising out of gun control laws are applicable to all persons who deal in firearms, doing business in compliance with such laws obviously constitutes the "ordinary course of trade" for that industry. Significantly too, Mr. William F. Slye, plaintiff's vice president and treasurer, readily admitted on cross-examination that the regulation of firearm sales by the Government had no effect on plaintiff's selling prices for the merchandise in the United States, and the regulations had no effect on plaintiff's competitive position *vis-a-vis* other dealers or sellers of firearms in the United States (R. 62).

In addition to *Getz*, defendant has also called attention to *Magnolia Petroleum Company* v. *United States*, 53 Cust. Ct. 355, R.D. 10786 (1964), *aff'd*, 54 Cust. Ct. 804, A.R.D. 188 (1965). There, the trial judge held that the mere fact that purchasers of the merchandise involved had to obtain a license in order to make use of material produced by a patented process did not *ipso facto* create a controlled market in the legal sense. Similarly, in the present case the fact that plaintiff's customers were required to obtain gun licenses or permits is not inimical to a free offering of the merchandise as between seller and purchaser.

In addition to *Berben*, plaintiff relies on *United States* v. *Graham & Zenger, Inc.*, 31 CCPA 131, C.A.D. 262 (1943). There, the Government of Belgium precluded purchasers for home consumption from disposing of merchandise for any use except for home consumption. No issue was presented regarding the effect of gun control regulations or any form of licensing on the free offering of merchandise. Consequently, unlike *Getz*, *Graham* is not based on a factual situation analogous to that presented here.

The short of the matter is that plaintiff has not negated the existence of U.S. value predicated upon its compliance with the gun control laws in the United States, as contended by defendant.

3.

The parties agree that there was no export value for the final list merchandise. Plaintiff contends that if the sales restrictions pursued by plaintiff (in compliance with the gun control laws) [5] do not negate U.S. value, then that basis of appraisement is proper for selected pistols, as set forth in plaintiff's exhibit 9 and appendixes D and E to plaintiff's brief. Defendant maintains that U.S. values exist for plaintiff's pistols, although such values have never been determined by the Customs Service in view of its appraisements on the basis of foreign value.

Plaintiff has advanced alternative U.S. values revolving around the question of whether excise tax levied on the sale of the pistols in the United States are a permissible deduction under section 402a(e). I have concluded that plaintiff has established its alternative claim for the U.S. values of selected pistols set forth in exhibit 9 and appendix D of plaintiff's brief, which values include the excise tax on the sale of the pistols in the United States. These values, which cover six selected pistols, are:

| Pistol model nos.: | U.S. values |
|---|---|
| PPK 7.65 mm | $43. 12 |
| PPK 9 mm | 43. 12 |
| PP 7.65 mm | 43. 12 |
| P–38 9 mm polished | 60. 69 |
| P–38 .22 lr | 60. 69 |
| P–38 9 mm; matt | 45. 62 |

I agree with defendant that the decision of the Court of Customs and Patent Appeals in *Stoeger Arms Corp.* v. *United States*, 46 CCPA 59, C.A.D. 696 (1958) is dispositive of the excise tax issue. In *Stoeger Arms*, the appellate court held that under the old law (now section 402a(e)) an internal revenue tax imposed on the sale of rifles was included in computing U.S. value since the tax was part of the price at which the merchandise was "freely offered for sale for domestic consumption."

Plaintiff posits, however, that *Stoeger Arms* was erroneously decided by our appellate court in light of that court's subsequent decision in *United States* v. *International Packers, Limited*, 48 CCPA 80, C.A.D.

---

[5] As previously observed, in compliance with the gun control laws, plaintiff restricted its sales to U.S. citizens who had not been convicted of a major crime, who were not under indictment or fugitives, and who were 21 years of age or over.

769 (1961). In the latter case, the appellate court held that the phrase "other necessary expenses from the place of shipment to the place of delivery" in the statutory definition of U.S. value should be so construed that U.S. value as determined thereunder will approximate a foreign value if one had existed. But in *International Packers* there was no dispute as to the price at which the merchandise was freely offered for sale for domestic consumption in the United States. The court emphasized that "the sole issue [in *International Packers*] is whether the exchange retention charge required by Argentina is within the statutory provision for deduction from the U.S. sales price of 'other necessary expenses from the place of shipment to the place of delivery'." (48 CCPA at 85.) Moreover, in *International Packers* the appellate court specifically noted and *distinguished Stoeger* on the ground that in the latter case it was interpreting a different term in the statute (viz, "price" rather than "necessary expenses". Accordingly, I am clear that there is no basis in *International Packers* which warrants departure from the court's prior holding in *Stoeger*.

Following the *Stoeger* decision, I hold that an excise tax, such as that applicable to the Walther pistols herein, is includable in U.S. value as part of the price of the merchandise. See also *John H. Faunce, Phila., Inc.* v. *United States*, 25 CCPA 131, T.D. 49245 (1937), which rejected the argument that an excise tax imposed in the United States on sale therein of the imported merchandise was properly allowable as a deduction in calculating U.S. value.[6]

Turning to plaintiff's other figures and computations entering into the calculation of the U.S. values for the selected pistols, defendant challenges only the allowances for general expenses and profit, and the other elements of U.S. value are not in dispute. Section 402a(e) provides for an allowance for profit not to exceed 8 per centum and a "reasonable allowance" for general expenses not to exceed 8 per centum. Plaintiff in computing U.S. values, deducted the maximum of 8 per centum for each category of allowance on the basis that the actual amounts for each exceeded 8 per centum. The sole question argued by the parties is whether plaintiff's method of computing general expenses and profit leads to the expenses and profit related to the imported merchandise.

On that aspect, plaintiff relies upon the testimony of Mr. Slye. In explaining how his company calculated its general and administrative expenses, Slye testified that plaintiff utilized its audit records (combined statement of plaintiff and its two subsidiaries) for the 6-month

---

[6] Plaintiff here argues that "to include excise tax in U.S. value continues to attribute to Congress an intent to place a tax on a tax without equitable justification". However, in *Stoeger*, the appellate court noted that the double taxation argument had been previously considered in *Faunce*, and rejected. Similarly, I see no merit to the double taxation argument in the present case.

period ending November 30, 1968, and arrived at an average general expense per weapon sold (R. 49, 74–75). This average figure is not disputed by defendant. With reference to this average figure for general and administrative expenses per firearm sold, Slye explained (R. 49):

> * * * Now, when you consider that every firearm that we handle has to be entered, warehoused, picked for orders, packed where necessary, invoiced, priced, handled by secretaries, from the paperwork, and by officers addressing themselves to it, we felt this was a very fair application of our G. & A. expense.

Mr. Slye further stated that since the average general expense per weapon exceeded the 8-percent maximum allowance, the maximum allowance was used. Slye also explained that the general expenses for the Walther products may have been a little less than the average figure because its surplus firearms line required a "little bit more handling" (R. 52).

With respect to profit, Slye testified that it was calculated at 12 to 13 percent of the sales price, or well in excess of the 8-percent maximum allowance, so that the 8-percent allowance was used (R. 51).

Defendant argues that plaintiff's method of calculating its general expenses was improper, since plaintiff utilized its average expenses relating to all the firearms sold, whereas only the expenses incidental to the sale of Walther or similar pistols are relevant. In support of its argument, defendant relies on *Hill Brown Corp.* v. *United States*, 54 CCPA 99, C.A.D 917 (1967) and *Judson Sheldon International Corporation* v. *United States*, 51 Cust. Ct. 374, R.D. 10586 (1963), *aff'd*, 54 Cust. Ct. 773, A.R.D. 183 (1965). And see *National Carloading Corp.* v. *United States*, 60 CCPA 54, C.A.D. 1080, 469 F. 2d 1398 (1972). Plaintiff concedes that under the foregoing cases it had the burden of proving the general expenses and profit chargeable to the imported merchandise, and that simply proving the average figures for all of plaintiff's firearms would not sustain that burden. In its reply brief (pp. 21–22) plaintiff articulates its contention as follows:

> The legal principles in this area are clear: Determining an average general expense for all product lines is indeed a permissible first step in determining general expense for the merchandise in issue. A plaintiff runs into trouble only if it stops at that point, and fails to correlate the company average to the imported merchandise. Thus, in both *Hill Brown* and *National Carloading*, plaintiffs made no attempt to establish such a correlation, and in both it lost on that basis. *Nat'l Carloading, supra*, at 1401. Where an importer has taken the second step by relating company average figures to the specific merchandise at issue, there has been no hesitancy to recognize the deductions as appropriate. *United States* v. *E. H. Corrigan*, 36 CCR 639, 647–48, ARD 67 (1956). [Footnote omitted.]

> In the instant proceeding, Interarms did not stop with the company average in its proof of general expense. Rather, it continued—as Defendant *totally* ignores—to correlate that average per unit sold to the Walther units, as described above. In so doing, Interarms specifically and directly—and without challenge—filled the void left by plaintiffs in *Hill Brown* and *National Carloading*, and fully satisfied the statutory proof requirements. [Italic in original.]

Slye's testimony establishes that the general expenses and profit chargeable to the Walther pistols were only slightly less than the average figures, which were appreciably in excess of the 8-percent maximum allowances. As explained by Slye, all firearms handled by plaintiff had to be entered, warehoused, picked for orders, packed where necessary, invoiced, priced, and processed by secretaries and officers of the companies (R. 49). Thus, plaintiff insists that proof of average general expenses and profit for all of the imported firearms is a permissible starting point in this case since plaintiff also correlated the average figures with the imported merchandise. On this score, plaintiff cites *United States* v. *E. H. Corrigan*, 36 Cust. Ct. 639, A.R.D. 67 (1956).

In *Corrigan*, a witness responsible for the sale of the merchandise in question testified that the general expenses of his firm were never less than 15 percent, and that the expenses in connection with merchandise in issue were greater than the usual general expenses of the firm. Here, Slye's testimony shows that the general expenses relating to the Walther products may have been "a little less" than the average expenses for all its firearms, but substantially exceeded the 8-percent maximum statutory allowance.

In the authorities relied on by defendant, the importers attempted to attribute a proportionate share of the total operating expenses of the companies to the imported merchandise, notwithstanding that the companies were engaged in several distinct kinds of business operations selling completely unrelated commodities that may have been susceptible to different percentages of general expenses and profits. By contrast, in the present case, plaintiff is engaged in a single business operation, viz, selling firearms, respecting which the record shows that plaintiff's personnel performed similar tasks. In this situation, it is reasonable to assume that the general expenses and profit chargeable to the Walther pistols closely approximated the average figures calculated for its entire line of firearms, which substantially exceeded the 8-percent maximum allowances.

It is well settled that the statutory provision covering U.S. value is to be interpreted liberally. *Hill Brown Corp.* v. *United States, supra,* at 103; *United States* v. *Robert Reiner, Inc.*, 35 CCPA 50, 59, C.A.D. 370 (1947). Under all the facts and circumstances, I conclude that plaintiff has sustained its burden of proving the proper allowances for general expenses and profit for the six selected pistols enumerated

above. However, for those pistols on the final list for which no evidence of U.S. values was submitted by plaintiff, the appraised values must be sustained. Plaintiff had the burden of not only proving that the appraisements were wrong, but additionally it had to establish the correct dutiable values. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593 (1955); *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495 (1952). As mentioned, *supra*, plaintiff has failed to negate the existence of a U.S. value basis of appraisement. Accordingly, valuation on the residual cost of production basis, as claimed by plaintiff, is precluded. *United States* v. *Oscar E. Eggen*, *supra*.

### NONFINAL LIST MERCHANDISE (ACCESSORIES AND AIR PISTOLS)

Finally, we consider the accessories and air pistols, which are not on the final list and were appraised on the basis of constructed value, as defined in section 402(d) of the Tariff Act of 1930 as amended. Pursuant to section 402(a)(1)(3) of the Tariff Act of 1930 as amended, the preferred statutory basis for valuing imported merchandise is export value, as defined in section 402(b). *Jack Bryan, Inc.* v. *United States*, 80 Cust. Ct. 169, C.D. 4752 (1978); *The American Greiner Electronic, Inc.* v. *United States*, 79 Cust. Ct. 92, C.D. 4718, 441 F. Supp. 915 (1977). Plaintiff claims that the nonfinal list merchandise should have been appraised at values represented by the invoice prices on the preferred export value basis. If plaintiff has established its claimed export values, the presumption of correctness attaching to the appraisement on the basis of constructed value is overcome in light of the statutory preference of export value over constructed value.

The appraised and claimed unit values (as set forth in appendix A, page 2, of plaintiff's brief) are:

| | Appraised unit value | Claimed unit value |
|---|---|---|
| 50 air pistols (LP 2) | $37.50 | $30.24 |
| 1,000 leather holsters for Walther P–38 pistol | 5.50 | 4.44 |
| 200 leather holsters for Walther PPK pistol | 3.25 | 2.60 |
| 100 magazines for Walther TP 6.35 mm pistol | 1.75 | 1.40 |
| 300 magazines for Walther PPK 7.65 mm pistol | 2.88 | 2.32 |
| 100 magazines for Walther PP 7.65 mm pistol | 2.88 | 2.32 |
| 100 magazines for Walther PP .22 lr pistol | 3.63 | 2.92 |

Inasmuch as the merchandise was sold to plaintiff on an exclusive distributorship basis (R. 19, 54, 60, exhibit 1, para. 3), plaintiff was a "selected purchaser" within the purview of section 402(f)(1)(B).[7] With

---

[7] The "selected purchaser" provision in sec. 402(f)(1)(B) applies where the seller *"selects"* one or more purchasers, restricting its sales to them and not selling or offering its merchandise for sale to all purchasers at wholesale". *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, 127, C.A.D. 846 (1964); *Judson Sheldon International Corporation, Island Woods International* v. *United States*, 67 Cust. Ct. 577, 580, A.R.D. 295, 331 F. Supp. 1393 (1971). Here it is undisputed that plaintiff was a "selected purchaser" within the purview of the statute.

reference to that section, Judge Miller, writing for the Court of Customs and Patent Appeals in *D. H. Baldwin Co. and Koeller-Struss Co.* v. *United States,* 65 CCPA 67, 72, C.A.D. 1208, 577 F. 2d 704 (1978), observed:

> \* \* \* The language of section 402(f)(1)(B) [footnote omitted] indicates that Congress contemplated that an export value can be established for merchandise based on sales to a single selected purchaser if the price "fairly reflects the market value of the merchandise." As we said recently in *Spanexico, Inc.* v. *United States,* 64 CCPA 6, 10, C.A.D. 1176, 542 F. 2d 568, 571 (1976)—
>> Appellant does not deny that, as a selected purchaser of \* \* \* [the manufacturing exporter], it was obliged to show that the price it paid for the imported merchandise fairly reflected market value. In deciding whether such a showing has been made, we consider whether the sales were at arm's length and the evidence showing the relationship between appellant and [the manufacturing exporter]. \* \* \*
>
> *Accord, American Greiner Electronic, Inc.* v. *United States,* 79 Cust. Ct. 92, C.D. 4718, 441 F. Supp. 915 (1977); *National Carloading Corp.* v. *United States,* 57 Cust. Ct. 758, 759, A.R.D. 215 (1966).

Plaintiff urges—and I agree—it has established that the invoice unit prices fairly reflect the market value of the merchandise on the basis the record shows that the seller (Walther) and the purchaser (plaintiff) were wholly unrelated, and that the sale prices were reached by arm's-length negotiations and bargaining (see R. 54–55; exhibit 1, para. 3; exhibit E). By stark contrast, defendant has pointed to nothing in the record even remotely suggesting that the prices paid by plaintiff for the accessories and air pistols were in any manner contrived or rigged, or that the dealings between Walther and plaintiff were not at arm's length and bona fide in all respects. Therefore, I agree with plaintiff's contention that the invoice prices fairly reflect the market value of the nonfinal list merchandise within the meaning of section 402(f)(1)(B), and that export value is the proper basis for the appraisement of that merchandise. *Cf. Ernest Lowenstein, Inc.* v. *United States,* 78 Cust. Ct. 169, R.D. 11779, 425 F. Supp. 856 (1977), *aff'd, United States* v. *Ernest Lowenstein, Inc.,* 80 Cust. Ct. 211, A.R.D. 325, 451 F. Supp. 988 (1978).

### Conclusion

To recapitulate:

(a) Foreign value as defined in section 402a(c) of the Tariff Act of 1930, as amended, was nonexistent for the Walther pistols during the relevant period of time in view of Walther's resale price maintenance and customer selection practices in the home market of West Germany.

(b) In 1968, no other pistols were sold in the home market that were "similar" to the Walther pistols within the meaning of section 402a (c), and accordingly there was no foreign value for "similar" merchandise.

(c) The parties agree that export value as defined in section 402a(d) did not exist for the final list merchandise.

(d) Plaintiff's argument that U.S. value as defined in section 402a(e) did not exist for the final list merchandise due to restrictions on the sale of the pistols pursuant to the gun control laws is without merit.

(e) Plaintiff's alternatively claimed U.S. values for selected pistols (including excise tax) are established by the record.

(f) Respecting those pistols for which no proof of U.S. values was adduced by plaintiff, the appraised values are sustained.

(g) Export value as defined in section 402(b) is the proper basis for appraisement of the accessories (holsters and magazines) and air pistols, and the export values are represented by the invoiced unit sales prices, as claimed by plaintiff.

Judgment will be entered accordingly.